## IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF ARKANSAS
## LITTLE ROCK DIVISION

IN RE:  L.B. BRYANT and                                      4:07-bk-15787 E
MARY LOUISE BRYANT, Debtors                                  CHAPTER 11

## MEMORANDUM OPINION AND ORDER
## CONDITIONALLY CONFIRMING CHAPTER 11 PLAN

Now before the Court is the Third Amended Plan of Reorganization proposed by the Debtors, L.B. Bryant and Mary Louise Bryant (the **"Third Amended Plan"** or **"Plan"**). Objections have been filed by secured creditors Bank of England (the "**Bank**") and the Farm Service Agency ("**FSA**").  Also before the Court is a Motion to Dismiss filed by the Bank. The Court held an evidentiary hearing on these matters June 29, 2010, and June 30, 2010. Randy Rice appeared on behalf of the Debtors; Stuart Headlee appeared on the Bank's behalf, and Stacey McCord, Assistant U.S. Attorney, appeared on behalf of the FSA.  After the close of evidence and closing arguments, the Court denied the Bank's Motion to Dismiss, stated that the Plan would be confirmed but may require some alterations, and took the objections to confirmation under advisement.  Having reviewed the evidence, arguments of counsel, and applicable law, the Court finds the Debtors' Plan is confirmable but will require a recalculation of the Bank's claim to account for interest at the contract rate until the effective date of confirmation.

This is a core proceeding pursuant to 11 U.S.C. § 157(b)(2)(L). The Court has jurisdiction to enter a final judgment in this case. The following shall constitute findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.[1]

## INTRODUCTION

The Debtors are lifelong farmers. They have been married 42 years and have lived in their home since 1974. They purchased the farmland at issue in this case between 1975 and 1996. The Debtors' property consists of a 50 acre tract, upon which the Debtors' home and a shop building are located, along with three 20 acre tracts located across the street (this 110 acres is collectively referred to as the "**Home Tract**"), and approximately 283 acres,[2] comprised of a few different tracts, none of which is more than 2 miles from the Home Tract (the "**Remaining Tracts**"). The Bank holds a first lien on the Home Tract. The exact amount of the Bank's claim is disputed; the figures put into evidence range between $155,105.79 and $169,682.12. FSA holds a junior lien on the Home Tract and a first lien on the Remaining Tracts, the Debtors' crops, and farming equipment. Pursuant to an agreed order entered on a prior objection to confirmation by FSA, FSA holds a secured claim of $425,180.

Several years ago, the Debtors experienced difficulties with their farming operation. Mrs. Bryant began working full-time at a factory a little over five years ago, and the Bryants

---

[1] This Opinion satisfies the *Request for Specific Findings of Fact and Conclusions of Law* filed by the Bank on July 13, 2010.

[2] Debtors' counsel explained at the Hearing that the Remaining Tracts totaled between 281 and 283 acres and those numbers were used interchangeably to refer to the acreage.

initially filed for bankruptcy relief under Chapter 12 on November 29, 2005 (4:05-bk-40188). Just over four years ago, Mr. Bryant began working full time (50-60 hours per week) at a factory while farming in his free time. Mrs. Bryant also helps with the farm in her free time by running errands and keeping the books.

The Debtors' Chapter 12 case was dismissed on July 31, 2007, due to the Debtors' failure to timely confirm a plan and failure to file monthly operating reports. Debtors filed their petition for relief under Chapter 13 of the Bankruptcy Code on October 18, 2007, and subsequently converted their case to one under Chapter 11 on November 21, 2007. Debtors have filed four plans of reorganization in this case and have continuously negotiated with their creditors as described herein. They propose to fund their current plan with their wages and farm income.

The objections raised by the FSA and the Bank, as well as the Motion to Dismiss filed by the Bank, are the subject of this Opinion. The Bank moves to dismiss the Debtors' case based on the length of time Debtors have been in bankruptcy without confirming a plan. Pointing to the Debtors' 2005 bankruptcy which was dismissed in 2007, along with this bankruptcy filed in 2007, the Bank argues the Debtors have been in bankruptcy too long without confirming a plan. At the close of the hearing in this matter, the Court orally denied the Bank's Motion to Dismiss, finding that the Debtors are making a good faith effort to propose and confirm a feasible plan of reorganization that will repay their creditors the amounts required by the Bankruptcy Code.

With respect to confirmation of the Debtors' Plan, the Bank objects to the interest rate

proposed by the Plan and the extension of the repayment terms on its loans to 12 years. The Bank also argues the Plan is not confirmable and is not feasible in that it calls for approximately $60,000 of annual payments while Debtors are currently operating at a net loss according to their Chapter 11 operating reports. FSA joins the Bank in objecting to the Plan based on feasibility. FSA also objects to the valuation the Debtors have placed on certain equipment the Debtors propose to retain and to the Debtors' proposal to pay FSA $4,000 in exchange for FSA's release of its junior lien attached to the Home Tract. FSA objects to the calculation the Debtors use to value this lien, and asserts that Debtors cannot bifurcate FSA's claim because FSA's loans are cross-collateralized and secured by all of the Debtors' real property.

## FACTS

### Procedural History

Debtors filed their petition for relief under Chapter 13 of the Bankruptcy Code on October 18, 2007. The Bank moved for relief from the automatic stay (docket #12) and moved to dismiss the Debtors' case (docket #11); the Court heard these matters on November 14, 2007, and denied both motions. Subsequently, the Debtors converted their case to one under Chapter 11 on November 21, 2007. Debtors filed a plan of reorganization on April 9, 2008 (docket #60, the "**First Plan**"), together with a disclosure statement (docket #61). The Bank and the United States Trustee filed objections to the adequacy of the disclosure statement (docket #64, #65). The Bank's objection was sustained by agreed order (docket #73), and the Court sustained the United States Trustee's objection after a hearing held on

4

June 17, 2008 (docket #75). Debtors filed an *Amended Disclosure Statement* on September 30, 2008 (docket #85), and a *Second Amended Disclosure Statement* on November 12, 2008 (docket #86). The Bank again objected (docket #90) and filed a motion to dismiss the case (docket #91). These objections were resolved by agreement, and an order approving the *Second Amended Disclosure Statement* was entered February 2, 2009 (docket #103).

Meanwhile, the Debtors had filed their Amended Plan (the "**First Amended Plan**") on January 12, 2009 (docket #94). The Bank accepted the terms of the First Amended Plan (which provided for payment of its claim at 8.5% interest over five years with the balance to be paid off with a balloon note at the end of five years), and based on the agreement reached with Debtors as to the Bank's claim amount and treatment under that plan, the Bank agreed to withdraw its pending motion to dismiss, and an *Agreed Order Resolving Motion to Dismiss Chapter 11 Bankruptcy* was entered (docket #99) (the **"Agreed Order on Bank's Motion to Dismiss"**) on January 20, 2009. The Agreed Order on Motion to Dismiss provided that the parties agreed to cooperate in moving forward in obtaining confirmation of the First Amended Plan and executing the First Amended Plan, and that the Debtors agreed to expeditiously prosecute the confirmation and execution of the First Amended Plan. However, FSA objected to confirmation (docket #110) because the First Amended Plan proposed no payments to FSA on its secured debt. Mr. Bryant testified he initially proposed no payments to FSA because he thought the debt he owed FSA would be wiped out by the

settlement owed him by FSA in the *Pigford* case.[3] The FSA's objection explained that the Debtors had received a cash settlement of $50,000 in the *Pigford* case, and debt relief of $355,690.82. The FSA maintained that the Debtors continued to owe $806,301.50, and that its secured claim was worth $425,180. The objection was sustained by an agreed order entered on October 29, 2009 (docket #149) which set the FSA's secured claim at $425,180. (It is not clear how the FSA arrived at the secured value of $425,180).

Debtors filed their third plan of reorganization (docket #153, the "**Second Amended Plan**") on November 30, 2009. FSA filed an objection (docket #157), as did the Bank (docket #158). The Debtors then filed their fourth plan of reorganization (docket #169, the "**Third Amended Plan**" or **"Plan"**) on March 15, 2010. The Bank and FSA subsequently filed objections to confirmation of the Third Amended Plan.

## The Debtors' Plan

The Debtors propose to fund their current plan with their wages and their farm income. The Debtors' Plan values the Home Tract at $205,627.31 comprised of a $56,000 value on the residence and 110 acres at $1,362 per acre. The Plan values the Remaining Tract at $382,722 (281 acres at $1,362 per acre). Mr. Bryant testified he originally valued

---

[3] In their Statement of Financial Affairs, Debtors disclosed that they are a party in the class action lawsuit *Pickford* [sic] *v. Secretary of Agriculture* concerning black farmers. This lawsuit is commonly referred to as the "Pigford case."

his acreage at $804 an acre but increased the values to $1,362 to match the FSA's secured claim of $425,180.[4]

The Plan proposes to pay the Bank's claim as of the date of filing with 5.5% interest over a 12-year period. Debtors calculate the Bank's claim to be $155,105.79 as of February 24, 2010, with future monthly payments equaling $1,488.43. The Debtors propose to begin making payments within 60 days of confirmation.

By Agreed Order, the FSA's secured claim is set at $425,180. The Debtors propose to surrender $6,200 of equipment to FSA, and to keep equipment valued at $32,370 and pay that amount to FSA at 5% interest over a five-year period with annual payments of $5,096 due each December 1.[5] Debtors propose to pay FSA $4,000 in order for FSA to release its junior lien on the Home Tract. The Debtors orally modified their plan at the hearing to propose to pay $4,000 to FSA immediately upon confirmation rather than making annual payments for five years, as proposed in the Plan. According to Exhibit 3 attached to the Debtors' Plan, the Debtors calculated the $4,000 value of FSA's junior lien on the Home Tract by subtracting the Bank's claim of $188,948.43 and the Lonoke County Tax Collector's claim of $12,677 from the Home Tract's value of $205,627.31. The Debtors

---

[4] Again, it is not clear how the FSA arrived at this figure. Debtors submitted Debtors' Exhibit 7 showing that this figure may be reached if the approximate $205,000 value assigned to the Home Tract is subtracted FSA's total appraised value on the Debtors' real property of $630,000. However, FSA's loan manager testified that the FSA had no basis for ascribing a $205,000 value to the Home Tract.

[5] Neither party has addressed the fact that this amount does not add up to the proposed total of $32,370 plus 5% interest. However, this is a mathematical calculation rather than a substantive factual or legal issue, and the Court leaves it to the parties to resolve.

7

propose to pay $382,610, which is the remainder of FSA's claim (arrived at by subtracting $6,200, $32,370 and $4,000 from the total allowed secured claim of $425,180), over a period of 20 years at 5% interest.  Debtors propose to begin making annual payments of $30,704.46 to FSA beginning on December 1, 2010.  Exhibit 3 to the Debtors' Plan lists the total value of FSA's security at $425,292 ($6,200 surrendered personal property, $32,370 retained personal property; $4,000 for the FSA's junior lien on the Home Tract; $382,722 for FSA's first lien on the Remaining Tracts).  This same calculation was introduced into evidence as Debtors' Exhibit 15.

The Debtors propose to pay the Internal Revenue Service a total of $10,821.56 at 5% interest or $207.60 per month.  The Debtors propose to pay the Lonoke County Tax Collector (**"Lonoke County"**) its secured claim of $18,580.57 at 5% interest over a period of 5 years (with monthly payments calculated to be $310).  Unsecured creditors with allowed claims are to be paid pro rata, with distributions of $500 per quarter not to exceed $3,000, beginning after  the Bank has been fully paid.

Lonoke County has voted and approved the plan, as did Lonoke County Co-Op, Inc. and Riche's Auto Repair & Wrecker.  Other creditors have not voted.

The Debtors' plan provides that if they do not comply with the terms of the Plan (*i.e.*, they fail to make a payment to the Bank in sixty days), then the Bank will be able to immediately begin the foreclosure process.  Likewise, if Debtors fail to make their first scheduled payment to FSA, FSA would be able to repossess the Debtors' equipment by the end of December and begin the foreclosure process on the Remaining Tracts.

8

## The Debtors' Farming Operation

Mr. Bryant believes he will be able to make the more than $60,000 in annual payments called for under the Plan, and that he would be able to make the first payments due in sixty days even if the Plan were confirmed the day of the Hearing. He also testified he would be able to pay FSA $35,000 in December of this year. Mr. Bryant testified that he has been making monthly payments to the Bank during most of his bankruptcy, and that he would be able to continue to do so. He explained that he and his wife are working full-time at factories, and are currently in the process of planting a crop.

Mr. Bryant testified that he formerly ran a much larger farm operation with one of his brothers, Mr. Eddie Bryant. He testified they farmed between 2,500 and 3,500 acres. Mr. Bryant explained that from this point forward, he would be farming primarily on his property which is all located within one or two miles from his home.[6] Mr. Bryant testified that all of his land is irrigated. Mr. Bryant testified he would be planting approximately 350 acres of his 393 total acres, and that he would be leasing an additional 40 acre tract, for a total of approximately 390 acres. Mr. Bryant testified he had 200 acres of soybeans planted, and plans to plant a total of at least 350 acres of soybeans. As of the date of the Hearing, it had been too dry to plant the other 150 acres, but it had rained the day before the Hearing, and Mr. Bryant and his two brothers stood ready to begin planting as soon as the Hearing

---

[6] Mr. Bryant testified he farmed very little in 2007 and 2008, and not at all in 2009 due to his lack of funds to plant a crop and the extremely wet weather that summer. On cross-examination by FSA's counsel, Mr. Bryant clarified he planted approximately 20 acres in 2009.

9

concluded.  Mr. Bryant testified that he and his brothers planned to have the remaining 150 acres planted by the end of the week.

The Debtors introduced Exhibit 14, Anticipated Farm Revenues for 2010.  Overall, their total anticipated farm revenue totals $108,800.  Mr. Bryant testified that the anticipated yield would be thirty bushels per acre of soybeans, and thirty bushels per acre for wheat.  He testified he had already "booked" about 5,000 bushels of soybeans – that is, he contracted to sell those soybeans at a fixed rate of $9.10 per bushel for a total of $45,500.  He anticipates producing an additional 6,700 bushels of soybeans and believes $6 per bushel is the lowest price he might get for those soybeans for a total of $40,200.  He testified he also planned on producing about 1800 bushels of wheat and believed he could sell the wheat for $4.50 a bushel for a total of $8,100.  The wheat would be planted in October or November of this year and sold in June or July of 2011.  Mr. Bryant testified he anticipates receiving government payments on his crops or farmland of approximately $15,000.  These estimated amounts total the $108,800 in anticipated farm revenue listed on Exhibit 14.

Mr. Bryant also testified that he anticipated his total farm expenses to be $35,000, resulting in a net amount of $73,800 to fund the Plan.  Mr. Bryant testified that he had $33,000 saved up in the debtor-in-possession account to fund the production of the crop as of the Hearing Date.  Additionally, he testified that he believes farming only his property and the one additional leased tract nearby will save substantially on gas, diesel and labor expenses, and that the Debtors will not need to pay their living expenses out of farm income because he and his wife have taken factory jobs and have no minor children living at home.

10

Mr. Bryant has been able to use his and his wife's wage income to save over $30,000 in cash while continuing to make payments to the Bank.

For labor, the Debtors plan to hire Mr. Bryant's two brothers. Mr. Bryant's brother, Mr. Robert Bryant, testified that he works nights four days a week and then has four days off. He has held his job for 10 years, and has been married for 18 years. He has farmed for approximately 25 years. He testified that he assists his brother (the Debtor) with his farming operations by running the planters that plant the soybeans, and he runs the tractor that breaks the ground to get it ready for planting. He testified that he was ready and able to assist the Debtor in planting his remaining acreage in soybeans and could devote three and a half of his four days off to helping his brother farm. He said he was prepared to begin the day of the Hearing as soon as he was done testifying and would plant as long as the light would allow. He explained that it had rained the day before which was what they needed to begin planting. Another of Mr. Bryant's brothers, Mr. James Bryant, testified that he also stood ready to assist the Debtor with his farming operation during his time off which included weekends and a lot of vacation time. Mr. James Bryant explained he had ample vacation time because he has worked for the same factory for 40 years.

### The Bank's Claim

The Debtors have four loans with the Bank. Bobby Dean Montgomery, Debtors' loan officer at the Bank, testified regarding each loan. For each loan, the applicable interest rate, the collateral, the original balance, and the current balance as of the date of the Hearing are outlined below. The loans are not cross-collateralized.

11

| Loan No. | Collateral | Interest Rate | Original Balance | Current Balance |
|---|---|---|---|---|
| 4747 | 20 acres | 10% | $ 11,250 | $ 19,080.12 |
| 4867 | 20 acres | 10% | $ 9,750 | $ 16,561.19 |
| 6289 | 20 acres | 9.1% | $ 8,775 | $ 18,061.76 |
| 8235 | 50 acres, residence, and shop building | 9.15% | $ 152,194 | $ 115,979.05 |

Foreclosures on these loans were previously interrupted by each of the Debtors' bankruptcy filings.

The Bank's initial proof of claim filed on December 19, 2007, was for $188,948.43. The Bank amended its proof of claim on April 30, 2009, to reflect a balance owed of $166,215.58 (the **"First Amended Bank Claim"**).[7]  Mr. Montgomery testified that this amount was determined by applying the contract rates of interest to the Debtors' various loans with the Bank.  He noted that these balances were increased periodically to reflect interest accrual and charges for legal fees.

Mr. Montgomery acknowledged that the Debtors have paid $54,364 to the Bank on these loans since their current case has been pending, and that the Debtors had paid approximately $45,000 to the Bank during their previous bankruptcy proceeding. Approximately $25,000 of this amount was paid to the Bank out of insurance proceeds received after a storm blew down a shop on the Debtors' Home Tract in 2008.  Mr.

---

[7] After the Hearing, the Bank amended its proof of claim, for the second time, on July 13, 2010, to reflect a balanced owed of $169,876.49.

Montgomery testified almost all of this $100,000 was applied to interest owed.  Mr. Montgomery agrees the Debtors' Home Tract is worth at least $205,000, as valued by the Debtors in their Plan.  He also agrees that the Bank is oversecured on all four of its loans.

Although the applicable interest rate on the Bank's loans range from 9.1% to 10%, the Debtors propose to pay the Bank 5.5% interest from the date of filing bankruptcy.  Debtors introduced evidence that the prime rate established by the Federal Reserve remained at 3.25% from December 24, 2008, through the date of the Hearing, and introduced a printout from the Federal Reserve website showing the prime rate from August 10, 1955, through June 23, 2010 as Debtors' Exhibit 11.  The prime rate at the time Debtors filed bankruptcy was 7.5%.  Mr. Bryant testified that he proposed an interest rate of 5.5% on the Bank's claim because it seemed fair and would allow for affordable payments under his Plan.

When asked what would be an appropriate interest rate that the Bank could offer customers like the Debtors today, Mr. Montgomery further testified that he would have to run through the Bank's pricing formula but believed the Bank would probably require an interest rate of about 10% if Debtors were to take out similar loans now.  He testified the Bank does not base its interest rates on the prime rate, but rather, uses a pricing formula that applies risk rating which takes into account the debtors' creditworthiness, the collateral and other risk factors.  Additionally, Mr. Montgomery testified that the Bank would not offer Debtors a term of more than five years on a fixed rate loan.  He explained that the Agri Department at the Bank had no loans with terms longer than five years on their books, and that it is their policy to only make loans for sixty months on a fixed rate of interest.  He

13

explained the Bank had some longer-than-five-year notes on their books, some of which were comprised of mortgages that had been sold, but had to be repurchased by the Bank due to defaults and the terms of the agreements under which the loans had been sold.

### The FSA's Claim

Although the Debtors originally owed FSA more than $800,000, FSA has a $425,180 secured claim pursuant to an Agreed Order. FSA's various loans to Debtors are cross-collateralized and secured by a lien on all of Debtors' real property, crops, and chattel including farming equipment. As to the Home Tract, FSA's lien is junior to the Bank's. FSA has received no payments during the pendency of Debtors' bankruptcy case.

Debtors did not provide for payment of FSA's claim in their First Amended Plan because they expected the claim to be offset by their settlement in the Pigford case.[8] Debtors' Second Amended Plan proposed to surrender certain personal property, valued at $6,200, and retain other personal property (mainly equipment) valued at $25,870.[9] Debtors' Third Amended Plan[10] does not change the personal property items to be surrendered and values them again at $6,200. It also proposes to retain the same items as were to be retained

---

[8] See footnote 3, *supra*.

[9] In their initial bankruptcy petition, the Debtors put a total value of $38,570 on their personal property. On December 17, 2007, Chana W. Thompson with the FSA appraised the Debtors' personal property at $88,925; a copy of this appraisal was introduced as Debtors' Exhibit 5. The property listed on the appraisal is substantially the same as that listed as either being retained or surrendered by Debtors in their Plan.

[10] Debtors' Third Amended Plan lists FSA's lien on the 50 acres where Debtors' home sits and the Remaining Tracts, but not the additional 60 acres included in the Home Tract. FSA objected to this omission. The Debtors acknowledged the FSA's lien on the entire Home Tract at the Hearing, and accordingly, this issue appears to have been resolved.

14

under the Second Amended Plan, but values them at $32,370, or $6,500 more than the

valuation used in the Second Amended Plan.  Mr. Bryant testified it was always his intent

to list the higher value of $32,370 for this property.  Debtors propose to pay this amount at

5% interest in five annual payments of $5,096.90 as they did in the Second Amended Plan.

 FSA's farm loan manager, Mark Len Petty, testified that he believed $32,370 was a

reasonable value for the personal property Debtors' propose to retain.

The Third Amended Plan values the FSA lien on the Home Tract at $4,000.  Although

Debtors proposed to pay the value of this lien plus 5% interest, in five annual payments in

the Third Amended Plan, they orally modified their Plan at the Hearing to pay FSA $4,000

immediately upon confirmation.  The Third Amended Plan provides that upon payment of

this amount, FSA will release its lien on the Home Tract.  FSA objects to this treatment on

both the legal basis that their claim cannot be bifurcated like this, and on the basis that the

Debtors have not properly valued their junior lien.

In their Third Amended Plan, Debtors value the Home Tract at $205,627.31.  Mr.

Bryant testified that this value is comprised of a $56,000 value attached to his house, plus

$1,362 per acre.[11]  Mr. Bryant testified at the Hearing that in order to value the FSA's junior

lien on the Home Tract, he had to value the Home Tract at $257,018.83 in his hypothetical

liquidation analysis (introduced as Debtors' Exhibit 12).   After subtracting the debt to the

---

[11] The 110 acres comprising the Home Tract were valued at $228,420 in the Petition.
After the Petition date, a shop that was on that parcel was blown down in a storm and Debtors
received $25,000 from their insurance company in payment for the loss.  Debtors accordingly
paid the $25,000 to the Bank as the first lienholder and reduced their valuation of the Home
Tract by $25,000.

Bank which was $188,948.83 at the time of his bankruptcy filing, subtracting real estate taxes of $12,670 owed to the county taxing authority, and subtracting a 20% liquidation expense of $51,400, Debtors calculated FSA's lien to be worth $4,000. The Debtors also submitted hypothetical liquidation analyses with their Home Tract valued at $205,625.43, and $228,420. After deducting the amount owed to the Bank and Lonoke County taxing authority and the cost of selling the property, these hypothetical sales indicate that FSA's junior lien is worthless.

At the Hearing Mr. Petty testified that FSA's prior appraisals had evaluated Debtors' real property as one single property and that such an appraisal would not be adequate for estimating values for individual tracts or parts, such as the Home Tract. Mr. William Michael Watts, who appraised the Debtors' real property for FSA, valued the 393 acres, residence and improvements at $630,000 as of June 25, 2009. He placed a value of $1,600 per acre on the land. He testified he would have used different comparables had he been appraising smaller tracts such as the Home Tract.

After subtracting the other secured claims ($6,200 in personal property to be surrendered, $32,370 in personal property to be retained, and $4,000 for FSA's junior lien on the Home Tract), there remains $382,610 owed to FSA and secured by the lien on the Remaining Tracts. The Debtors propose to pay FSA's secured claim on the Remaining Tracts at 5% interest in annual payments, but propose that those payments be made over 20 years. FSA does not object to this interest rate or term.

16

## MOTION TO DISMISS[12]

"Upon a showing of cause, section 1112(b)(1) requires the court to convert or to dismiss 'absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interest of creditors and the estate.'" *In re Daniels,* 362 B.R. 428, 436 (Bankr. S.D. Iowa 2007). The initial burden lies with the party seeking dismissal to establish cause for conversion pursuant to § 1112(b)(1). *See In re Gateway Access Solutions, Inc.*, 374 B.R. 556, 561 (Bankr. M.D. Pa. 2007). "Cause includes substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation, as well as 15 other enumerated grounds included in § 1112(b)(4)(A) through (P)." *In re Miell,* 419 B.R. 357, 366 (Bkrtcy. N.D. Iowa 2009). "'Whether cause exists under § 1112(b) and, if so, whether dismissal is appropriate are questions left to the sound discretion of the bankruptcy court.'" *In re Corinthian, LLC,* 2009 WL 363165, 4 (Bankr. E.D. Pa. 2009) (quoting *In re Brown,* 2005 WL 2589194, at *2 (Bankr. E.D. Pa. March 31, 2005)).

The Bank moves to dismiss the Debtors' Chapter 11 bankruptcy because this is the Debtors' second bankruptcy case filed on the eve of foreclosure; the Debtors did not confirm a plan in the prior Chapter 12 case; the present case was filed over two and a half years ago; and, despite the proposal of four different plans, the Debtors have not yet confirmed a plan. The Bank also specifically moves to dismiss the Debtors' case based on the Debtors'

---

[12] The Court denied the Bank's motion to dismiss at the close of the Hearing, but takes this opportunity to more specifically explain its reasoning.

alteration of the Bank's treatment under their First Amended Plan despite their agreement in the Agreed Order on Bank's Motion to Dismiss to expeditiously confirm the First Amended Plan.  The Motion to Dismiss further asserts that the Debtors do not, in good faith, intend to confirm a plan and repay creditors to the best of their ability, but rather are using the bankruptcy process to hinder and delay the Bank in its attempts to foreclose on its lien.

Mr. Bryant testified that he and his wife did not file their case in bad faith, but that he has proposed his plans in good faith with every intention of successfully reorganizing his debts and repaying his creditors. Debtors point out that during their prior Chapter 12 case, they filled out their monthly operating reports but their attorney never filed the reports with the Court.  Debtors also emphasize that although they did not confirm a plan while that case was pending, the Bank received $45,000 in adequate protection payments.  Debtors assert that the Bank has also received $54,000 since the 2007 case has been pending, including the $25,000 insurance proceeds received on account of the 2008 storm damage.  Debtors also explained that they had to change the Bank's treatment under the First Amended Plan in order to allow them to provide for payment to FSA which objected to its treatment under the First Amended Plan.

The Court finds that the Bank did not establish cause for dismissal of the Debtors' case under any of the enumerated examples of cause under § 1112(b)(4) or because the debtors' lacked good faith.  Specifically, although the Bank's objection is grounded in the time it has taken the Debtors to confirm a plan, there is no evidence that the Debtors' estate is deteriorating or that there is no reasonable likelihood of reorganization.  Rather, as

18

explained more thoroughly herein, the Court finds the Debtors' Plan to be feasible in that they have both wage income and reasonable projections of farm income with which to fund the Plan.

Moreover, although the Debtors agreed to expeditiously move forward with confirming their First Amended Plan, the FSA objected, causing the Debtors to rework their plan to provide for the FSA.  At the time Debtors proposed the First Amended Plan, they believed their debt to FSA would be wiped out by a settlement in the *Pigford* case.  Believing they owed nothing to FSA, the Debtors proposed to pay the Bank what they could – 8.5% interest for five years to be paid off with a balloon note.  FSA's objection showed that they still owed FSA a substantial amount.  FSA holds a secured claim valued at more than twice the secured claim held by the Bank, and the FSA's claim is secured by all the Debtors' property; the Debtors simply could not confirm the First Amended Plan as it was drafted. With payments of over $30,000 per year due to the FSA, Mr. Bryant testified he and his wife cannot afford to make payments to the Bank at a higher interest rate or make a balloon payment to the Bank after five years.  Mr. Bryant also believes they will not be able to obtain financing to make a balloon payment.  The Court finds no bad faith on the Debtors' part because they amended their plan to provide for payment to FSA, even if that required them to alter the terms originally proposed to the Bank.[13]

---

[13] *See generally Matter of Lafayette Dial, Inc.*, 92 B.R. 798, 800 (Bankr. N.D. Ind. 1988) (holding that debtor could not modify an agreed order without showing "a change in the conditions that make continued enforcement inequitable") (quoting *In re DeFilippis v. United States,* 567 F.2d 341, 344 (7th Cir.1977)).

Finally, as explained at the close of the Hearing, the Court does not find that the Debtors lack good faith. The Court found Mr. Bryant to be a credible witness and is persuaded that the Debtors are making a good faith effort to propose and confirm a feasible plan of reorganization that will repay their creditors the amounts required by the Bankruptcy Code. For these reasons, the Motion to Dismiss is denied.

## CONFIRMATION

Section 1129 of the Bankruptcy Code controls confirmation of Chapter 11 plans and the Court may not confirm a plan unless all of the requirements of § 1129 are met. *In re Reuter,* 427 B.R. 727, 769 (Bankr. W.D. Mo. 2010) (citing *In re Gilbertson Restaurants LLC,* 2005 WL 783063 (Bankr. N.D. Iowa 2005)). The plan proponent, the Debtors in this case, bear the burden of establishing that the requirements of § 1129 are met by a preponderance of the evidence. *Id.* The contested issues regarding confirmation of the Debtors' Plan in controversy in this case are: (1) the feasibility of the Debtors' Plan; (2) the pre-confirmation interest rate to be applied to the Bank's claim; (3) the post-confirmation interest rate to be applied to the Bank's claim; (4) the length of the repayment term of the Bank's claim; and (5) whether the FSA's claim may be bifurcated in order to release the FSA's lien on a portion of its collateral. The Court finds all other requirements for plan confirmation under §§ 1123 and 1129(a) are either not applicable or have been satisfied by the Debtors' Plan and the evidence presented at the confirmation hearing.

### **Feasibility**

Section 1129(a)(11) requires the court to find that "[c]onfirmation of the plan is not

20

likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). "This statutory section establishes what is commonly known as the 'feasibility' requirement, and essentially requires the courts to determine whether a plan is 'workable' before it is confirmed." *In re American Trailer and Storage, Inc.,* 419 B.R. 412, 420-421 (Bankr. W.D. Mo. 2009) (citing *Danny Thomas Properties II Ltd. P'ship. v. Beal Bank S.S.B. (In re Danny Thomas Properties II Ltd. P'ship.),* 241 F.3d 959, 962 (8th Cir.2001)). "'To satisfy the feasibility requirement, the Debtors need to establish only that the Plan has a reasonable probability of success.'" *Id.* (quoting *In re Apex Oil Co.,* 118 B.R. 683, 708 (Bankr. E.D. Mo. 1990). It is the debtor's burden to establish the feasibility of its plan by a preponderance of the evidence. *Id.* at 421 (citing *Danny Thomas,* 241 F.3d at 963). "Courts generally grant debtors every reasonable benefit of the doubt in matters concerning plan feasibility in furtherance of the rehabilitative policies underlying the Code." *In re Richards*, 2004 WL 764526, 3 (Bankr. N.D. Iowa 2004) (citing *In re Tofsrud*, 230 B.R. 862, 872-73 (Bankr. D.N.D. 1999)).

The Bank asserts that the Debtors' Plan is not feasible because the Debtors will be unable to make the payments required under the Plan.  FSA joins the Bank in its argument regarding feasibility.  The Bank contends that the Debtors' monthly operating reports show a net loss during the bankruptcy case.[14]  Debtors respond that they made monthly payments

---

[14] The Court notes that for most months, the Debtors' operating reports show a profit, but they apparently had increased expenses in February, April and May causing a net loss.  In May, the most significant expense was seed; in April, chemicals; in February, legal fees.

21

to the Bank from the beginning of their bankruptcy through February 2010. Mr. Bryant also testified that in the future, he anticipates planting substantially more crops than he has in the past few years. He testified that although he has not planted a large amount of land recently, he has in the past, and therefore knows he will be able to do so. Based on this expectation of increased harvests, the Debtors projected their anticipated farm income over the life of the Plan. Mr. Bryant also testified that although he formerly farmed his own land in addition to leased land (totaling 2500-3500 acres), he would now only be farming his land and an additional 40 acres of leased land. His own land is within two miles of his home which will save on fuel and other expenses. His brothers are committed to helping him with the labor required to farm his property.

Mr. Bryant further testified that he is prepared to make all the payments that would be immediately required upon confirmation of the Third Amended Plan. He testified he had saved up $33,000 from his and his wife's wage income to help fund the farming operation. He also testified that between their wage income and the projected income from his farming operations, he will be able to make the required payments under his Plan.

The Court finds these projections are reasonable, and with modest success in farming, the Debtors will have more than enough income to make the payments required by the Plan. The Court recognizes authority holding that "[a] plan projecting a marked increase in profitability with no explanation of the cause is not confirmable," and that "[t]he debtors' income and expense projections are considered in conjunction with their actual past performance to determine feasibility." *In re Richards*, 2004 WL 764526, 3 (Bankr. N.D.

Iowa 2004) (citing *In re Euerle Farms, Inc.*, 861 F.2d 1089, 1091 (8th Cir.1988)).[15] However, in this case, the Debtors have provided an adequate and convincing explanation for why and how they expect to be more successful farming than they have in the past. Accordingly, the Court finds the Plan is feasible, even accounting for the changes required by this Order.

## The Bank's Claim:  Pre-confirmation Interest Rate

The Plan proposes to pay the Bank $155,105.79 over 12 years, with 5.5% interest, for its claims secured by the Home Tract.  Both testimony at the Hearing and Debtors' Exhibit 13 show that the Debtors calculated the Bank's claim by applying the proposed 5.5% interest rate to the Bank's claim as of the Petition date.  The Bank objects to the calculation of its claim by using the reduced interest rate for the period prior to plan confirmation.  The Bank is correct on this point.  As explained below, an oversecured creditor is entitled to interest at the contract rate for the post-petition, pre-confirmation period pursuant to 11 U.S.C. § 506(b).

Section 506(b) of the Code provides,

To the extent that an allowed secured claim is secured by property the value of which, . . . , is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

---

[15] *See also In re Smith*, 333 B.R. 94, 98 (Bankr. M.D.N.C. 2005) ("Success need not be guaranteed – the possibility that a plan may fail is not fatal – but a plan must be supported by adequate evidence that some reasonable assurance of success exists.") (citing *Kane v. Johns-Manville Corp.,* 843 F.2d 636, 649 (2d Cir.1988); *In re Prussia Assocs.,* 322 B.R. 572, 584 (Bankr. E.D.Pa. 2005)).

Section 506(b) permits oversecured creditors to recover post-petition interest on their claims

from the petition date until the confirmation or effective date of the plan. *Rake v. Wade,* 508

U.S. 464, 471, 113 S.Ct. 2187, 2191, 124 L.Ed.2d 424, 433 (1993). "The 'rate of interest to

be paid is the contract rate.'" *In re Miller,* 341 B.R. 764, 766 -767 (Bankr. E.D. Mo. 2006)

(quoting *In re Johnston,* 44 B.R. 667, 669 (Bankr. W.D. Mo. 1984)).[16]   The Bank is an

oversecured creditor, and accordingly, the interest rate on the Bank's claim, as modified by

a confirmed, cramdown plan, will change on the effective date of the plan and will not be

retroactively applied to the date of filing.[17]

## Cramdown of the Bank's Claim: Post-Confirmation Interest Rate

The Bankruptcy Code provides that the Court may not confirm a plan that all impaired

---

[16] *See, e.g., In re White,* 260 B.R. 870, 879 (B.A.P. 8th Cir. 2001) ("In its decision in [*U.S. v. Ron Pair Enter., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026 (1989)] the Supreme Court did not set the rate at which an oversecured creditor is entitled to recover such interest; however, most courts have concluded that 'postpetition interest should be computed at the rate provided in the agreement, or other applicable law, under which the claim arose – the so-called contract rate of interest.'" (citing 3 Lawrence P. King, Collier on Bankruptcy ¶ 506.04[2][b][i] (15th ed. revised 2000)). *See also Prudential Insurance Company Of America v. Monnier (In re Monnier Brothers),* 755 F.2d 1336, 1338 (8th Cir.1985) ("Since the Prudential loan was accelerated and oversecured, Prudential had a right at the date the plan became effective to the unpaid principal plus any contract rate interest that had accrued up until that time.")*; In re Lockard,* 234 B.R. 484, 494 (Bankr. W.D. Mo. 1999) ("The Bank is entitled to its contract rate of interest through the date of confirmation . . ."); *In re Value Recreation, Inc.,* 228 B.R. 692, 696 (Bankr. D. Minn. 1999) ("11 U.S.C. § 506(b) entitles an oversecured creditor to interest at the contract rate during pendency of a bankruptcy case prior to confirmation of a plan.").

[17] Although the Bank's loan officer, Mr. Montgomery, testified that the balance as of the date of the Hearing was $169,682.12, and the Bank has since submitted a claim for $169,876.49, the Debtors' counsel objected to this calculation as including improper attorney fees.  That issue was not before the Court at the Hearing, and accordingly, no decision is made at this time as to whether or not particular charges included on the Bank's proof of claim are proper or not.

classes have not accepted, unless the plan meets the requirements under 11 U.S.C. § 1129(b),

commonly referred to as a "cramdown."  11 U.S.C. § 1129(a)(8) and (b).  The cramdown

provisions of §1129(b) require that a plan "not discriminate unfairly," and that it be "fair and

equitable with respect to each class of claims or interests that is impaired under, and has not

accepted, the plan."  If a debtor proposes to keep property securing a claim, the debtor's plan

is fair and equitable if it provides:

> (I)  that the holders of such claims retain the liens securing such claims . . . to the allowed amount of such claims; and
> (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property.

11 U.S.C. § 1129(b)(2)(A)(i).[18]  Thus, the plan must provide for paying the secured creditor

the present value of its claim.  However, the Bankruptcy Code does not specify how the

appropriate interest rate on such a claim is to be calculated.  In the Chapter 13 case context,

the Supreme Court embraced what is commonly referred to as the "formula approach" in *Till

v. SCS Credit Corp. (In re Till)*, 541 U.S. 465, 476 n.14 (2004).[19]  Under the formula

---

[18] A fair and equitable plan may also provide for the sale of the creditor's collateral subject to the creditor's lien (11 U.S.C. § 1129(b)(2)(A)(ii)), or may provide for the realization by the secured creditor of the indubitable equivalent of its claim (11 U.S.C. § 1129(b)(2)(A)(iii)).

[19] In adopting the formula approach, the plurality rejected the "coerced loan rate," the "presumptive contract rate" and the "cost of funds rate," finding that "the formula approach entails a straightforward, familiar, and objective inquiry, and minimizes the need for potentially costly additional evidentiary proceedings."  *Till*, 541 U.S. at 479.  The Court also stated, "[m]oreover, the resulting 'prime-plus' rate of interest depends only on the state of financial markets, the circumstances of the bankruptcy estate, and the characteristics of the loan, not on the creditor's circumstances or its prior interactions with the debtor."  *Id.*

25

approach, the court first considers the current national prime rate of interest, which according to the Supreme Court, "reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default." *Till*, 541 U.S. at 466. Then, "[b]ecause bankruptcy debtors typically pose a greater risk of nonpayment than solvent commercial borrowers," a bankruptcy court must adjust the prime rate upwards to account for that risk. 541 U.S. at 479. "The appropriate size of that risk adjustment depends on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan. The plurality recognized that courts have generally approved a risk premium of 1 to 3%." *In re American Trailer & Storage, Inc.*, 419 B.R. 412, 434 (Bankr. W.D. Mo. 2009) (citing *Till,* 541 U.S. at 479-480). "The appropriate size of the adjustment, per *Till,* will depend on factors such as the circumstances of the estate, the nature of the security and the duration and feasibility of the reorganization plan. The creditor bears the burden of proof on this issue." *In re Prussia Associates,* 322 B.R. 572, 591 (Bankr. E.D. Pa. 2005).[20]

*Till* involved a Chapter 13 case. Although the Supreme Court noted the likelihood that Congress intended the same approach to be applied under any cramdown provision, citing to the present value provisions in sections 1129(a), 1129(b), 1173(a), 1125(a) and

---

[20] *See also Till*, 541 U.S. at 484-485 ("Thus, the formula approach, which begins with a concededly low estimate of the appropriate interest rate and requires the creditor to present evidence supporting a higher rate, places the evidentiary burden on the more knowledgeable party, thereby facilitating more accurate calculation of the appropriate interest rate.").

1228(b), 541 U.S. at 474-475, n. 10, the Supreme Court recognized a difference in the lending markets for Chapter 13 and Chapter 11 debtors. Specifically, the Supreme Court stated, in dicta, that while there was "no free market of willing cramdown lenders" in the Chapter 13 context, "the same is *not* true in the Chapter 11 context, as numerous lenders advertise financing for Chapter 11 debtors in possession. . . . Thus, when picking a cramdown rate in a Chapter 11 case, it might make sense to ask what rate an efficient market would produce." 541 U.S. at 476 n.14 (emphasis in original). This footnote in *Till* led to the adoption by the Sixth Circuit Court of Appeals of a two-step process for determining the appropriate cramdown interest rate in a Chapter 11 case. *See Bank of Montreal v. Official Committee of Unsecured Creditors (In re American Homepatient, Inc.),* 420 F.3d 559 (6th Cir. 2005). First, the Court is to determine whether an efficient market exists for a Chapter 11 debtor, and if it does, the Court should look to that market for an appropriate interest rate. If no efficient market exists for a Chapter 11 debtor, then the bankruptcy court should use the formula approach as described in *Till*.[21] Other courts addressing this issue have reached a similar conclusion and have adopted the same or a similar test for determining whether *Till* applies in the Chapter 11 context. *See In re American Trailer & Storage, Inc.*, 419 B.R. at 436 (listing cases).

---

[21] For a much more thorough examination of *Till* and *American Homepatient*, see *In re American Trailer & Storage, Inc.*, 419 B.R. 412 (Bankr. W.D. Mo. 2009). *See also* Gary W. Marsh & Matthew M. Weiss*, Chapter 11 Interest Rates After Till*, 84 AM. BANKR. L.J. 209 (2010).

In *In re American Trailer & Storage, Inc.*, Chief Judge Dennis Dow applied the two-prong analysis set forth in *American Homepatient*, and found that it also comported with existing pre-*Till* Eighth Circuit case law. *Id.* at 436-438 (Judge Dow's opinion includes an in-depth description of existing Eighth Circuit case law regarding appropriate cramdown interest rates). Judge Dow ultimately concluded:

> Based on the somewhat confusing and loose use of the term "prevailing market rate" in the Eighth Circuit, this Court finds that it is on firm ground to adopt the nuanced version of *Till* in the Chapter 11 context, which involves first considering the existence of an efficient market and if there is not one, then resorting to the formula approach.

*Id.* at 438. This Court agrees with Judge Dow's analysis and adopts the two-prong test set forth in *American Homepatient*.

The Court must first determine whether there is an efficient market for debtor-in-possession (**"DIP"**) financing in this case. There is no proof of such a market before the Court;[22] in fact, there is no evidence of any market rates. Mr. Montgomery, the Bank's loan officer, testified that in order to determine what interest rate his bank would offer customers like the Debtors today, he "would have to run through the Bank's pricing formula" which uses risk rating to take into account the debtors' creditworthiness, the collateral, and other risk factors. Mr. Montgomery had not applied this formula to determine what interest rate the Bank would charge the Debtors for a similar loan, and therefore, could not say what

---

[22] The Court takes judicial notice that Chapter 11 cases filed in Arkansas account for less than 1% of total cases filed; accordingly, it is unlikely that an efficient market exists for DIP financing for individual farmers like the Debtors in this case. *See* Bankruptcy Case Statistics for the United States Bankruptcy Court for the Eastern and Western Districts of Arkansas at http://www.arb.uscourts.gov/courtinfo/stats.html; Fed. R. Evid. 201.

28

interest rate the Bank would charge the Debtors for a similar loan today; however, he testified that he believed they would probably qualify for a 10% interest rate today, just as they had when their loans were originally taken out.  In any case, even if Mr. Montgomery had determined the interest rate the Bank would charge the Debtors now, that is not evidence of an efficient market.

With no evidence of an efficient market for DIP financing, the Court is left to apply the formula approach as articulated in *Till*.  The Debtors introduced evidence from the Federal Reserve showing that the national prime rate remained at 3.25% from December 24, 2008 through the date of the Hearing. The prime rate remains at 3.25% as of the date of this Opinion.  The Court is left then to determine the percentage of interest necessary to adjust that rate to account for the risk of default.  *See American Trailer*, 419 B.R. at 439; *In re Deep River Warehouse, Inc.,* 2005 WL 2319201, 11 (Bankr. M.D.N.C. 2005).  Under *Till*, the Bank had the burden to prove what an appropriate adjustment to the prime rate would be, and the Bank offered no evidence on this point other than Mr. Montgomery's subjective opinion that the Debtors should still be paying their contract rate of approximately 10% interest.

The Debtors added 2.25% to the prime rate to arrive at what they believed was a fair interest rate that would allow them to repay the Bank.  The Court finds this is an appropriate adjustment based on the factors cited by *Till* (*i.e.*, the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan).  The circumstances of this estate are favorable for allowing the Debtors to fund their Plan (which also goes to the feasibility of the Plan, as discussed earlier in this Opinion).  Having

29

experienced financial difficulties in the past while running a large farming operation on many acres of leased land, the Debtors have since scaled back their farming operation to their own acreage (along with one 40 acre leased tract). The Debtors' land is irrigated, and the Debtors already own the equipment they will need.  As of the date of the Hearing, the Debtors had already planted 200 acres and stood ready to plant the remaining 150 acres at the close of the Hearing.  Mr. Bryant's brothers are committed to helping as much as possible, and their testimony evidenced their experience and capacity.  The Debtors have reduced some of their expenses by farming near their home.  More importantly, the Debtors are not solely relying on farm income to fund their plan.  They have both taken on full-time factory jobs and have earned enough to save up $33,000 to fund their farming operation.  (They were not able to farm in prior years because they did not have the cash necessary to plant a crop.)  They have been able to make $1,300 monthly payments to the Bank for the majority of their bankruptcy case, and have paid approximately $75,000 to the Bank since they first filed in 2005 (not including the $25,000 the Bank received on account of the 2008 storm damage). Furthermore, the collateral in this case is real estate.  There is no evidence the real estate is depreciating or is in any danger of depreciating. The Bank agrees it is oversecured on all its loans.  Finally, based on the Court's conclusions regarding feasibility of the Debtors' Plan, the Court finds the proposed duration of payments under the Plan to be reasonable.  The Debtors propose to pay the Bank over 12 years, and the FSA over 20 years.  Although longer repayment terms may justify an increase in the applicable interest rate, *In re American Trailer*, 419 B.R. at 440, the Court finds the adjustment proposed by the Debtors of 2.25%

30

above the prime rate adequately adjusts for the risk associated with the Plan and the extended

repayment term (discussed below) while providing the Bank with the value of its interest in

Debtors' collateral.

### Length of Repayment Term on the Bank's Claim

The Bank objects to the Debtors' proposal to extend the repayment terms of the loans

to 12 years.  Section 1129 does not specifically prohibit a debtor from altering the original

repayment period on a loan.  *See e.g., In re Mulberry Agr. Enterprises, Inc.*, 113 B.R. 30, 32

-33 (D. Kan. 1990). As quoted by the *Mulberry* court, Bankruptcy Judge Pusateri stated in

*In re White*, 36 B.R. 199, 203 (Bankr. D. Kan. 1983):

> The Court believes that § 1129 does not per se prohibit long term payouts. If
> the mathematical requirements of § 1129(b)(2)(A)(i)(II) are satisfied, if the
> creditor is adequately protected under the plan, pursuant to the general fair and
> equitable requirement of § 1129(b)(2), and if the debtors can prove they can
> make payments over the life of the plan pursuant to § 1129(a)(11), then the
> plan is confirmable and can be crammed down on a rejecting class of secured
> claim holders, regardless of normal lending practices or policies.

*Id.* at 33.  *See also In re Mulnix,* 54 B.R. 481, 484 (Bankr. Iowa 1985) ("The legislative

history to Section 1129(b) states that, to be fair and equitable, debtor's plan has to satisfy only

one of the three conditions as the plan relates to a secured creditor.  . . .  Here, debtor has

proposed to allow creditor to retain her lien and to be paid present value.  Thus, the minimum

statutory test has been met.") (citations omitted).

Nevertheless, in determining whether a stretched out repayment period is fair and

equitable, courts often look to the applicable markets, when at all possible, to determine what

is reasonable, and should consider the preexisting contract length and the customary length

of repayment for similar loans. *See, e.g., In re Torelli*, 338 B.R. 390, 397 (Bankr. E.D. Ark. 2006) (citing other cases in application of this principle to a Chapter 12 case); *In re Koch*, 131 B.R. 128, 131 (Bankr. W.D. Mo. 1999) (Chapter 12 case). "Courts also look at the 'life expectancy' of the collateral, the risk of default, and the risk that the collateral will lose value." *In re Richards*, 2004 WL 764526, 4 (Bankr. N.D. Iowa 2004) (citations omitted). "A payout over 20 years is not excessive or unreasonable when the collateral is real estate." *In re Mulnix,* 54 B.R. at 484. *See also In re SM 104 Ltd.,* 160 B.R. 202, 231 (Bankr. S.D. Fla. 1993) (collecting cases). Numerous courts have likewise allowed debtors to stretch out repayment periods. *See e.g., In re Mulberry Agr. Enterprises, Inc.*, 113 B.R. at 32 (citing *In re Billman*, 93 B.R. 657, 660 (Bankr. S.D. Iowa 1988) (seven-year note stretched to 25 years with a balloon payment after 15 years noting that debtors are often allowed to pay claims secured by real estate over a 30-year period); *In re Snider Farms, Inc.*, 83 B.R. 977, 999 (Bankr. N.D. Ind. 1988) (loan secured by farmland stretched to thirty years not unreasonable); *In re O'Farrell*, 74 B.R. 421, 423 (Bankr. N.D. Fla. 1987) (thirty years is a reasonable period for a loan secured by real estate); *In re Martin*, 66 B.R. 921 (Bankr. D. Mont.1986) (stretchout of note and mortgage from seven to twenty years confirmed)).

In this case, the Debtors have provided for the Bank to retain its lien, and have provided for the payment of a fair interest rate so that the Bank will receive the present value of its claim. As discussed earlier, the upward adjustment of 2.25% to the prime rate is sufficient to compensate the Bank, in part, for the lengthened repayment term given that the Debtors are likely to be able to make payments under their Plan, the Bank is oversecured, and

the collateral is improved farmland unlikely to depreciate in value. Although Mr. Montgomery testified that the Bank's practice is to hold fixed rate loans of terms no longer than 5 years, the documents filed together with the Bank's proof of claim show that the Bank does indeed make loans with terms at least as long as ten years. Two of the loans giving rise to the Bank's claim originally had ten year terms, including the loan secured by the Debtors' home. Given that the collateral securing the Bank's claim is improved farmland, the Court finds a repayment term of 12 years is both fair and equitable.

### Cramdown of FSA's Claim

FSA's loans to Debtors are cross-collateralized and secured by certain personal property, primarily consisting of farm equipment, as well as a junior lien on the Debtors' Home Tract and a first lien on the Debtors' Remaining Tracts. Debtors propose to surrender some equipment while retaining the remainder of their personal property. Debtors propose to retain all their real property. The Plan provides that FSA will keep its first lien on the Remaining Tracts and the Debtors' personal property as security for the debt owed FSA, but that FSA will release its junior lien on the Home Tract in exchange for a $4,000 lump sum treatment. FSA objects to the Debtors' attempt to "bifurcate" its claim secured by all the Debtors' property by proposing to pay off just the junior lien attached to the Home Tract. As explained below, the Court finds that the Debtors' proposal to pay FSA as set forth in their Plan is fair and equitable because the Plan provides FSA with the indubitable equivalent of its secured claim.

33

For a debtor's plan to be found "fair and equitable" as required by § 1129(b), the debtor must satisfy one of the three tests found in § 1129(b)(2)(A).  If the plan provides for the debtor to retain property, the plan must provide for the secured creditor to retain its lien on such property and the secured creditor must be paid the present value of its claim pursuant to § 1129(b)(2)(A)(i) as discussed earlier in this Opinion.  The plan may also provide for the sale of the creditor's collateral subject to the creditor's lien pursuant to § 1129(b)(2)(A)(ii)), or the plan may provide for the realization by the secured creditor of the indubitable equivalent of its claim pursuant to § 1129(b)(2)(A)(iii).  "The three avenues for cramdown under §§ 1129(b)(2)(A) are phrased in the disjunctive." *In re Kellogg Square Partnership*, 160 B.R. 343, 367 n. 47 (Bankr. D. Minn. 1993)*.*  Accordingly, a plan need satisfy only one of the three tests set forth in § 1129(b)(2)(A).  *See In re Monnier Bros.,* 755 F.2d 1336, 1339 (8th Cir. 1985) (describing § 1129(b)(2)(A)(iii)'s "indubitable equivalent" standard as an alternative to deferred repayment of secured debt under § 1129(b)(2)(A)(i)(II), but finding the indubitable equivalent standard also applied to selecting an appropriate interest rate under § 1129(b)(2)(A)(i)(II)).

The Debtors' Plan provides for a $4,000 payment to FSA to satisfy its junior lien on the Home Tract.  The FSA's loans are cross-collateralized, and therefore, its claim is secured by both the Home Tract and the Remaining Tracts as well as the Debtors' personal property and crops.  Accordingly, the Debtors' plan does not provide that FSA will retain its lien, and therefore, the Plan does not meet the test set forth in § 1129(b)(2)(A)(i).  Additionally, because the Debtors seek to retain the Home Tract, the test set forth in § 1129(b)(2)(A)(ii)

providing for sale of collateral with liens attaching to the sale proceeds is not applicable. However, the Court must also analyze whether the Debtors' plan provides for the indubitable equivalent of the FSA's secured claim under § 1129(b)(2)(A)(iii). In other words, flunking the test set forth in § 1129(b)(2)(A)(i) which requires that a creditor retain its lien does not preclude a debtor from satisfying the indubitable equivalence test set forth in § 1129(b)(2)(A)(iii). *See e.g., CoreStates Bank, N.A., v. United Chemical Technologies, Inc.,* 202 B.R. 33, 50-51 (E.D. Pa. 1996) (Although district court concluded that the debtor's plan failed to satisfy § 1129(b)(2)(A)(i)(I) because it released the creditor's machinery and equipment liens arising out of several cross-collateralized loans, the district court remanded the case to the bankruptcy court to determine whether the plan provided the creditor with the indubitable equivalent of its secured claim as allowed under § 1129(b)(2)(A)(iii).).[23]

Section 1129(b)(2)(A)(iii) provides that a plan may be confirmed as fair and equitable over the objections of a secured creditor if the plan provides the creditor with the "indubitable equivalent" of its secured claim. "[T]he debtor must show that the creditor will receive the indubitable equivalent of its claims by a preponderance of the evidence." *See Matter of Briscoe Enterprises, Ltd., II,* 994 F.2d 1160, 1165 n. 26 (5th Cir. 1993).

---

[23] *See also In re Keller*, 157 B.R. 680, 683 (Bankr. E.D. Wash. 1993) ("Since the Plan forces Creditor to partially release her lien against Broadview without her lien attaching to the proceeds of any of the released properties, the Plan does not satisfy §§ 1129(b)(2)(A)(i). But failure to satisfy § 1129(b)(2)(A)(i) is not fatal to confirmation if the Plan does satisfy § 1129(b)(2)(A)(iii)."); *Matter of Atlanta Southern Business Park, Ltd.*, 173 B.R. 444, 451 (Bankr. N.D. Ga.1994) ("It is true that the confirmation provisions of the Code contemplate lien retention as a way to determine if a plan offers fair and equitable treatment to an impaired secured creditor. The provision on lien retention, however, is offered as an *alternative* to, and not a requirement of, the indubitable equivalent test.").

Accordingly to legislative history, this phrase originated in Judge Learned Hand's ruling in

*In re Murel Holding Co.,* 75 F.2d 941, 942 (2d Cir.1935). *See In re Monnier Bros.,* 755 F.2d

at 1338-1339 (citing *American Mariner Industries*, 734 F.2d 426, 433 (9th Cir.1984)). In

*Monnier,* the Eighth Circuit Court of Appeals stated:

> As the Ninth Circuit has noted, *Murel* emphasized two factors in determining
> whether a reorganization plan provided a secured creditor adequate
> protection[24] for the full value of his claim:

>> Judge Hand concluded that the creditor's right to 'get his money
>> or at least the property' may be denied under a plan for
>> reorganization only if the debtor provides a 'substitute of the
>> most indubitable equivalence.' Such *a substitute clearly must
>> both compensate for present value and insure the safety of the
>> principal.*

*Id.* at 1339 (quoting *Mariner* and adding emphasis). The Third Circuit Court of Appeals has

described the requirement of "indubitable equivalence" as follows:

> Though broad, the phrase "indubitable equivalent" is not unclear. Indubitable
> means "not open to question or doubt," *Webster's Third New Int'l Dictionary*
> 1154 (1971), while equivalent means one that is "equal in force or amount" or
> "equal in value," *id.* at 769. The Code fixes the relevant "value" as that of the
> collateral. *See* 11 U.S.C. § 1129(b)(2)(A)(iii) (requiring the "indubitable
> equivalent" of the secured claim); *id.* § 506(a) (defining a secured claim as
> "the extent of the value of such creditor's interest in the estate's interest in such
> property"). Thus the "indubitable equivalent" under subsection (iii) is the
> unquestionable value of a lender's secured interest in the collateral.

---

[24] The concept of adequate protection is inextricably linked to indubitable equivalence.
*See In re Sparks,* 171 B.R. 860, 866 (Bankr. N.D. Ill. 1994) ("The phrase 'indubitable
equivalent' appears twice in the Code; once in § 1129(b)(2)(A)(iii), . . . and once in § 361(3), as
part of the definition of 'adequate protection.'").

Further, the scope of the "indubitable equivalent" prong is circumscribed by the same principles that underlie subsections (i) and (ii), specifically, the protection of a fair return to secured lenders.  As the Fifth Circuit reasoned:

> Congress did not adopt indubitable equivalent as a capacious but empty semantic vessel. Quite the contrary, these examples focus on what is really at stake in secured credit: repayment of principal and the time value of money. Clauses (i) and (ii) explicitly protect repayment to the extent of the secured creditors' collateral value and the time value compensating for the risk and delay of repayment. Indubitable equivalent is therefore no less demanding a standard than its companions.

*Pacific Lumber,* 584 F.3d [229] at 246 [5th Cir. 2009].

*In re Philadelphia Newspapers, LLC,* 599 F.3d 298, 310-311 (3rd Cir. 2010).  Courts interpreting the indubitable equivalence standard have found cash payments, replacement collateral, abandonment of collateral, and combinations thereof, to be the indubitable equivalent of a secured claim.  *See e.g., Pacific Lumber,* 584 F.3d 229 (holding a cash payout met the "indubitable equivalent" requirement); *Matter of Sandy Ridge Dev. Corp.*, 881 F.2d 1346 (5th Cir. 1989) (holding that a deed-back of real estate collateral in its entirety is necessarily the indubitable equivalent of the creditor's secured claim)*; Matter of Sun Country,* 764 F.2d 406 (5th Cir.1985) (holding 21 notes secured by 21 lots of land the "indubitable equivalent" of a first lien on a 200 acre tract of land); *Matter of Atlanta Southern Business Park*, 173 B.R. 444 (Bankr. N.D. Ga. 1994) (finding combination of cash and real estate collateral equal to value of secured claim satisfies indubitable equivalent test); *In re Keller*, 157 B.R. 680 (Bankr. E.D. Wash. 1993) (allowing annuities to be substituted

for real estate collateral); *In re San Felipe @ Voss, Ltd.,* 115 B.R. 526 (S.D. Tex. 1990) (finding transfer of securities equivalent to first lien on real property).

Debtors propose to pay FSA $4,000 in exchange for FSA's release of its junior lien on the Home Tract. The Debtors also propose to surrender some personal property and to retain some personal property while paying for such property over time. The Debtors propose to pay the remainder of FSA's claim over time, and FSA will keep its first lien on the Remaining Tracts. As explained above, there is no prohibition on a debtor using several methods to provide a secured creditor with the indubitable equivalent of its claim. Courts have routinely allowed combinations of cash payments, payments over time, abandonment of collateral, and substitution of collateral. Courts have also allowed a debtor to abandon a portion of a secured creditor's collateral to the creditor in full satisfaction of its claim while retaining the remaining collateral free and clear of liens. *See e.g.*, *Matter of Atlanta Southern Business Park, Ltd.*, 173 B.R. 444, 449 (Bankr. N.D. Ga. 1994) ("A plan that includes the partial return of collateral may be confirmable under certain circumstances. One circumstance occurs where, as here, the creditor is oversecured and the value of the surrendered collateral is equivalent to the amount of the creditor's claim." ) (citing *In re Simons,* 113 B.R. 942, 946-47 (Bankr. W.D. Tex. 1990); *In re Elijah,* 41 B.R. 348, 351-52 (Bankr. W.D. Mo. 1984)). *See also Matter of May*, 174 B.R. 832, 837 (Bankr. S.D. Ga. 1994) (concluding that a proposal to surrender only a portion of collateral to an oversecured creditor in full satisfaction of its claim can provide such a creditor with the indubitable equivalent of its claim).

38

Accordingly, the Debtors' proposal to satisfy the FSA's claim through a lump sum payment, abandonment of some equipment, and repayment over time of the bulk of FSA's secured claim does not automatically doom confirmation of the Debtors' Plan. Additionally, despite the cross-collateralization of FSA's loans, the Debtors are not prohibited from removing FSA's lien on some of its collateral provided the Debtors adequately compensate the FSA for the entirety of its secured claim. *See Matter of May,* 174 B.R. 832, 838 (Bankr. S.D. Ga. 1994) (quoting *Matter of James Wilson Assoc.,* 965 F.2d 160, 171 (7th Cir. 1992)) ("'[T]he principle that liens pass through bankruptcy unaffected cannot be taken literally, ... and it is the law that, provided the plan of reorganization gives the secured creditor the 'indubitable equivalent' of its secured interest, the bankruptcy judge can force the creditor to accept the exchange.'").

FSA objects to Debtors' proposed payment of $4,000 in exchange for the FSA's release of its junior lien on the Home Tract on two grounds.[25] First, the FSA asserts that the Debtors raised the value of the equipment they propose to retain from $28,870 in their Second Amended Plan to $32,370 in their Third Amended Plan (thereby paying more to FSA for such equipment) in order to place a lower value on the FSA's junior lien on the Home Tract. This argument fails because the FSA agrees that the equipment is in fact worth $32,370 according to the testimony of Mr. Petty, FSA's farm loan manager. The Debtors

---

[25] Although the Debtors submitted hypothetical liquidation analyses showing that for FSA's junior lien to have any value, a substantially higher value would have to be placed on the Home Tract, the analysis required is not what the FSA would receive if the Home Tract were liquidated today, but whether the value of FSA's secured claim is adequately protected under the Plan.

39

initially ascribed a higher value to the equipment, and the FSA appraised the equipment for $88,925 as of December 17, 2007. Mr. Bryant testified it was always his intent to list the higher value of $32,370 for the property indicating that the lower figure of $25,870 was a mistake. For whatever reason, the Debtors placed a lower value on this property in their Second Amended Plan but reflected the higher value on the property in their Third Amended Plan. The Court does not find the change to be in bad faith. The FSA agrees the property is worth at least $32,370, and the Court finds that is an appropriate value to assign to the retained personal property for purposes of determining whether FSA will receive the indubitable equivalent of its secured claim.

Second, the FSA objects to the value of approximately $205,000 assigned to the Home Tract by the Debtors arguing that the FSA cannot determine whether that value is appropriate because its appraiser valued all the Debtors' real property as opposed to valuing the Home Tract separately from the Remaining Tracts. The fact that FSA conducted an appraisal of the Debtors' real property as a whole and did not separately value the Home Tract from the Remaining Tracts is not evidence of anything – it is simply an assertion that the values placed on the Debtors' property as a whole may not apply to the tracts individually. The FSA's appraiser, Mr. Watts, testified he would have used different comparable sales had he been asked to separately value these properties, but he did not say the value would necessarily be lower or higher if valued separately. In any case, the Debtors did not use the FSA's appraiser's value of $1,600 per acre but assigned a lower value of $1,362 per acre to their real property. Debtors are competent to testify as to their opinion of their property's

40

value,[26] and Mr. Bryant did so in this case.  His values were uncontroverted by any competent evidence.  The FSA only asserted the Court should not look to the values it assigned the Debtors' real property in its appraisal, and it is not.  The Court accepts the Debtors' valuation of their property.

Having rejected the FSA's valuation arguments, the Court turns to whether or not the FSA will receive the indubitable equivalent of its secured claim despite being required to release its junior lien on the Home Tract.  Applying the $4,000 value to the FSA's interest in the Home Tract, the Debtors calculate that FSA's secured claim of $425,180 is adequately protected, as shown in the calculation submitted as Debtors' Exhibit 15, which is reproduced below.

| **Payment or Collateral Description** | | **Value** |
|---|---|---|
| Personal property surrendered to FSA | $ | 6,200 |
| Personal property retained by Debtors (value to be paid to FSA over five years at 5% interest) | $ | 32,370 |
| FSA's first lien on the Remaining Tracts (281 acres at $1,362 per acre) to be paid at 5% interest over 20 years | $ | 382,722 |
| Cash payment for FSA's junior lien on the Home Tract | $ | 4,000 |
| **Total Payment or Security for FSA** | **$** | **425,292** |

---

[26] *U.S. v. 79.20 Acres of Land, More or Less, Situated in Stoddard County, Missouri,* 710 F.2d 1352, 1357 (8th Cir. 1983) ("A landowner is presumed to have special knowledge of his property. His testimony as to the value of his land is therefore 'admitted in federal courts *without further qualification.*'") (quoting *United States v. 3,698.63 Acres of Land,* 416 F.2d 65, 67 (8th Cir.1969) and adding emphasis).

The Court finds that a cash payment of $4,000 to FSA upon confirmation of Debtors' Plan along with the other payments and security provided to FSA under the Debtors' Plan will provide the FSA with the indubitable equivalent of its secured claim.

## CONCLUSION

The Court finds the Debtors' Plan was filed in good faith and is not subject to dismissal pursuant to 11 U.S.C. § 1112(b). Further, the Court finds the Debtors' plan is feasible even with the changes contemplated by this Opinion. The Debtors are required to pay the Bank its contract rate of interest through the date of confirmation, and accordingly, must submit a modified plan providing for such interest. The Debtors' proposal to pay the Bank 5.5% on its claim for a 12-year period is confirmed. The Debtors' proposal to pay FSA $4,000 in exchange for the FSA's release of its junior lien on the Home Tract is confirmed pursuant to 11 U.S.C. § 1129(b)(2)(A)(iii). If the Debtors modify their Plan within 14 days from the date of this order to provide for payment terms that are consistent with the findings in this Opinion, an order of confirmation will enter without further notice or hearing. Because the changes to the Third Amended Plan of Reorganization primarily impact the Bank and should not affect the other payments to be made under the Plan, the Debtors need not solicit acceptances of the Modified Third Amended Plan of Reorganization.[27]

For the reasons set forth herein, it is hereby

---

[27] "If modifications made to a plan prior to confirmation (but after the ballots have been counted) are minor, impact only a creditor who has been fully involved, and do not adversely impact any other creditor, then it is not necessary to solicit new acceptances." *In re American Trailer and Storage, Inc.,* 419 B.R. 412, 419 (Bankr. W.D. Mo. 2009) (citations omitted).

**ORDERED** that the Bank's Motion to Dismiss is **DENIED**; it is further

**ORDERED** that the Bank's Objection to Confirmation is **SUSTAINED IN PART**, and **OVERRULED IN PART**; it is further

**ORDERED** that the FSA's Objection to Confirmation is **OVERRULED**; and it is further

**ORDERED** that the Debtors' Third Amended Plan of Reorganization is hereby confirmed on the condition that Debtors file a modified plan providing for payment terms that are consistent with the findings in this Opinion within 14 days of the entry of this Opinion.

**IT IS SO ORDERED.**

*Audrey R. Evans*
Audrey R. Evans
United States Bankruptcy Judge
Dated:   10/08/2010

cc:    Debtors
        Mr. Randy Rice, attorney for the Debtors
        Mr. Stuart Headlee, attorney for the Bank
        Ms. Stacey McCord, Assistant U.S. Attorney
        U.S. Trustee
        all creditors per matrix

43